**UNITED STATES DISTERICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | **REDACTED VERSION** |
| v. | |
| AMIT AGARWAL, | 19 Cr. 838 (PAE) |
| Defendant. | |

## SENTENCING MEMORANDUM
## ON BEHALF OF AMIT AGARWAL

Peter M. Skinner
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York  10001
(212) 446-2300
pskinner@bsfllp.com

Brendan F. Quigley
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, N.Y. 10112
212 408 2520
brendan.quigley@bakerbotts.com

*Attorneys for Amit Agarwal*

Defendant Amit Agarwal respectfully submits this memorandum in advance of sentencing, which is scheduled for July 14, 2021. On February 11, 2021, Mr. Agarwal pleaded guilty to one count of conspiracy to participate in an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371, 1960(a), and 1960(b)(1)(A).

## PRELIMINARY STATEMENT

Amit Agarwal is deeply sorry for, and embarrassed by, his crime.  In many ways, before his inexplicable lapse in judgment, Mr. Agarwal was living the American Dream.  After his father's bankruptcy and the financial strain it caused his family when he was young, Mr. Agarwal worked hard to leave India and put himself through school in the United Kingdom and the United States. Discovering a love for business, he obtained two post-graduate business degrees and founded a consumer electronics company, Best Electronics, which he slowly built into a successful global business.

Although he reinvested nearly all of his profits, never enjoying the fabulous wealth that some associate with the tech industry, he lived well.  He married and fathered two sons.  In his small town in New Jersey, Mr. Agarwal found a family, a home, and a community in which he was actively engaged. He was charitable, raising money for the American Cancer Leukemia and Lymphoma Society while running three marathons from 2016 to 2018.

As a result of his crime, Mr. Agarwal squandered his American Dream and lost virtually everything he worked so hard in this country to build.  Mr. Agarwal had never before been arrested. And this was not, to use the Court's words at the initial conference in this case, a "confirmatory" sting.  (January 6, 2020 Tr. at 6:23).  Indeed, as the government acknowledged in response to the Court's inquires at that appearance, Mr. Agarwal was not "involved in drug-money laundering before an undercover enters the picture." (*Id.* at 7:5-7).

Nevertheless, there is no sugar coating what happened here, and Mr. Agarwal does not shy from the facts.  After getting wrapped up in a DEA sting operation designed to shut down narcotics money launderers, he used his business to facilitate the exchange of more than $900,000 worth of Colombian pesos for U.S. dollars outside the official banking system.  He understood that his Colombian customers, who were paying for cellphones with cash in Colombia, were likely avoiding Colombian taxes and import duties.  He also understands now that unlicensed money transmitting businesses, such as the one he participated in, can be used to launder the proceeds of more destructive crimes.

What he did is confounding to everyone who knows him.  By all accounts, Mr. Agarwal is "loving," "compassionate," "magnanimous," "polite, empathetic, respectful, and kind-hearted," "caring," "generous," "disciplined," "driven," "passionate," "hardworking," and "honest."[1]  After reading the numerous letters submitted on his behalf, we are hopeful that the Court will see him for who he truly is:  a loving father and husband, a loyal friend, and a hard worker.  Simply put, Mr. Agarwal's offense conduct is entirely at odds with his character and the way he has lived his life.

As a result of his offense conduct, Mr. Agarwal has destroyed much of his business, which is the sole source of support for his immediate family in the United States and an important source of support for his extended family in India.  He has also had to agree to forfeit to the U.S. Attorney's Office substantially more money than he made from his money transmitting business, in real dollars.

---

[1]    These quotes come from the many letters of support submitted by Mr. Agarwal's family, friends, and colleagues, which are attached at Exhibit C.  We note that the letters from Mr. Agarwal's mother and father, as well as those from Sonal Rathod, Satyanarayan Agarwal, and Sandhya Adhikary, were written by Mr. Agarwal's sister, Priyanka Agarwal, who translated and wrote down in English what the authors of the letters dictated to her in Hindi.

Most significantly, Mr. Agarwal—who is literally one step away from receiving his green card—and his family will almost certainly have to leave the United States and return to India, where his sons will be denied the American Dream that Mr. Agarwal worked so hard himself to achieve, and which he has now lost as a result of bad decisions for which he takes full responsibility. Indeed, as a result of his conviction in this case, Mr. Agarwal will have to leave the United States following completion of his sentence, it may be years before he is allowed to apply to return, and he is unlikely to be permitted to do so. If he is forced to return to India for years, his family will have no choice but to join him, as they will not separate from him.

In the PSR, the Probation Department recommends a six-month sentence, a significant variance from the applicable Guidelines range. Under the circumstances, we respectfully submit that a non-Guidelines, non-custodial sentence will serve as sufficient punishment and satisfy the other objectives of the Sentencing Guidelines and Section 3553.

## BACKGROUND

Mr. Agarwal was arrested on December 20, 2019, and released on December 23, 2019. He consented to the filing of a one-count Information on February 11, 2021. That same day, he pleaded guilty pursuant to a plea agreement, taking full responsibility for his crime.

The plea agreement contains the parties' agreement about the application of the Sentencing Guidelines, with which the Probation Office also concurs. (PSR ¶¶ 4, 126).[2] Section 2X1.1, which applies to the conspiracy to which Mr. Agarwal pleaded guilty, provides that the base offense level is determined by Section 2S1.3, the guideline governing the substantive offense of participating in

---

[2]    Mr. Agarwal previously objected to certain portions of the PSR. A copy of those objections is attached at Exhibit D. The Probation Office has incorporated some of those objections and rejected others. To the extent not adopted, Mr. Agarwal reiterates his objections to the PSR, though we note that none of them effect the Guidelines range or the offense conduct.

an unlicensed money transmitting business.  Pursuant to that section, Mr. Agarwal's base offense level is 6, a 14-level increase applies because of the amount of funds involved (an amount driven largely by the DEA undercover sting operation), and the offense level is increased by an additional 2 points because Mr. Agarwal knew or believed that the funds were the proceeds of unlawful activity.  A 3-level reduction is warranted because of Mr. Agarwal's acceptance of responsibility, for a total offense level of 19.  He has absolutely no criminal history, yielding an advisory Guidelines range of 30-37 months. (PSR ¶¶ 77-86).  The Probation Office recommends a below-Guidelines sentence of 6 months' imprisonment.  PSR at 41.[3]

For the reasons expressed below, Mr. Agarwal respectfully requests a non-Guidelines and non-custodial sentence.

## A NON-CUSTODIAL SENTENCE IS APPROPRIATE IN THIS CASE

As the Court is well aware, a criminal sentence must be "sufficient, but not greater than necessary" to meet the objectives of sentencing.  18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).  In crafting a sentence, "the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 477 (2011).

### A.    Mr. Agarwal's Personal History and Characteristics

Mr. Agarwal is 39-years old.  He has built a successful life as an entrepreneur.  Born in 1982 in India and raised there, Mr. Agarwal grew up in an entrepreneurial family.  During his late teens, the family suffered financial setbacks, forcing his father to declare bankruptcy, and, in 2002,

---

[3]    The PSR recommends a fine of $50,000, and yet also acknowledges that Mr. Agarwal has agreed to pay forfeiture of $2,174,999.28, which is far in excess of the funds involved in the offense.  (PSR at 41).  Mr. Agarwal respectfully submits that, in light of his forfeiture, no fine is appropriate.

4

Mr. Agarwal left India for England.  There, he worked his way through a graduate-business program and sent money back to his family.

As part of his U.K. studies, Mr. Agarwal was selected for an exchange program at the University of Florida and came to the United States.  He remained in the United States following his graduation in 2003, moving into a friend's home in Chicago.

During this time, the market for digital cameras and iPods was beginning to explode outside the United States.  Mr. Agarwal saw an opportunity and started his business, Best Electronics, in approximately October 2003, buying electronics in the U.S. and re-selling them to customers overseas.  Eventually, this morphed from a part-time way to earn extra money into a full-time business, and Mr. Agarwal moved to New Jersey to be closer to his New York-based suppliers.  While in New Jersey, he pursued another graduate degree, obtaining his MBA from Fairleigh Dickinson University.

After the introduction of the iPhone in 2007, Mr. Agarwal's focus gradually shifted to selling Apple products and other smart phones.  During this time, Mr. Agarwal's customers were mainly in Europe, and later the Middle East.

From its humble beginnings, Mr. Agarwal's business grew exponentially.  Best Electronics was one of Inc.com's 5000 fastest growing companies in 2015 and 2016.  It is an authorized reseller of Apple products concentrating on iPhones and has ranked among the top five iPhone exporters from the United States for multiple years.  In 2018, Best Electronics also became an authorized South American distributor for Xiaomi, a Chinese company that is the third largest distributor of cellphones in the world.  Best Electronics had revenues of $46 million in 2012, $73 million in 2015, $165 million in 2019, and $140 million in 2020.

During the years he spent building his company, Mr. Agarwal also built a family and a life here in the United States.  He married his wife Sonal in 2009.  They have two sons, ages eight and four, both of whom were born here and are U.S. citizens.  The eight-year-old has just completed third grade at Woodmont Elementary School in Montville, New Jersey, and the four-year-old attends Pre-K in Montville, which is about an hour outside Manhattan.  The Agarwal children enjoy artwork, dancing and reading.

Mr. Agarwal also worked to attain permanent legal status.  In 2015, Mr. Agarwal, with the aid of counsel, applied for a green card through the EB-5 program.  However, before this application could be fully adjudicated, his then-current visa expired in early 2019, and he voluntarily left the United States (as he had before when a visa expired), with the intention of re-applying for a visa (and re-uniting with this family here), as soon as he was eligible.  Sonal has a separate student visa, and she stayed here so their children could continue to attend school and be with their friends.

Mr. Agarwal re-applied for a visa after returning to India in 2019 but was initially denied.  He re-applied again and was approved, after, unbeknownst to him, the government obtained an indictment and approved his visa for purposes of arresting him.  Shortly before Christmas 2019, Mr. Agarwal arrived at Newark Airport on his way to see his family for the holidays.  Instead, agents met him in the jetway and arrested him on the charges in this case.

Since being released on bail, Mr. Agarwal's immigrant visa petition, which had been pending since 2015, has been approved.  But as a result of his conviction, he will be forced to return to India.  Once back in India, he will have to complete his application for an immigrant visa to return to the United States.  The reality is that he has minimal chance of getting approval to return following this felony conviction.

6

Even if allowed to return, the time he will have to wait before he can do so will depend on the length of his sentence. If permitted to depart within six months after the imposition of his sentence, he can potentially return to the United States immediately after he receives his immigrant visa at the U.S. Consulate in India. If forced to depart more than six months after the imposition of his sentence, he likely will not be able to return to the United States for at least three years. And if forced to depart more than one year after the imposition of his sentence, he will not be able to return to the United States for at least ten years.

Moreover, if removed (that is, if he is not permitted to depart voluntarily), he will additionally be barred from applying to return for either five or ten years.

If unable to return to the United States in the near-term, Mr. Agarwal plans to move his family to India.

**B.    The Nature and Circumstances of the Offense**

Mr. Agarwal engaged in illegal conduct, participating in an unlicensed money transmitting business, for which he takes full responsibility. The government asserts in the PSR, and will surely take the same position in its sentencing arguments, that the evidence supports the inference that Mr. Agarwal must have known he was being paid with narcotics proceeds. (PSR at 38). This is not correct. Mr. Agarwal did not have this subjective knowledge, and it is not the only permissible inference from the evidence. We explain as much below, but in doing so, we do not intend to minimize, rationalize, justify, or otherwise shy away from the crime Mr. Agarwal committed and pleaded guilty to: participating in an unlicensed money transmitting business with knowledge that it was being used to evade Colombian taxes and export duties. Mr. Agarwal is fully aware of what he has done, he takes full responsibility for it, and he is immensely remorseful.

1.      **Mr. Agarwal Meets the CS Years Before the Conduct Underlying the Offense**

Mr. Agarwal first met the DEA confidential source — known to Mr. Agarwal as Henry Salazar — in Colombia in or about 2010, which is when Mr. Agarwal first tried to conduct business in Colombia.   Beginning in approximately early 2011, Mr. Salazar bought cellphones from Mr. Agarwal for distribution in Colombia.   Around this time, Mr. Salazar and two other Colombian customers began paying Mr. Agarwal in cash through associates in the United States.  By mid-2012, Mr. Agarwal had grown uneasy with getting paid this way, particularly after the individuals delivering the cash refused to complete IRS Form 8300s, as required for cash payment in excess of $10,000.   After this, Mr. Agarwal refused to accept cash payments in the United States, and he stopped doing business with Mr. Salazar.  (PSR ¶ 11).

Still, Mr. Salazar kept in contact with Mr. Agarwal, sending him messages by WhatsApp and otherwise.   And Mr. Salazar's persistence in renewing business with Mr. Agarwal intensified from 2016 into 2018, when he sent dozens of text messages, samples of which are included in the PSR.   (PSR ¶ 15).   None of those messages were inculpatory in any way.   To the contrary, Mr. Salazar was continually trying to ingratiate himself with Mr. Agarwal as a potential distributor for phones and other electronics products in Colombia.   (*Id.*).

2.      **Mr. Agarwal Renews Contact with the CS**

Mr. Agarwal did virtually no business in Colombia from 2012 until 2018.   By early 2018, however, Mr. Agarwal was seeking to expand in the South American market.   Among other things, Apple had begun to open its own stores in the Middle East, which was cutting into Mr. Agarwal's market share there.[4]  To this end, Mr. Agarwal took steps to become an authorized South American

---

[4]      *See, e.g.*, James Cook, *The World's Largest Apple Store Might Be Built Inside a Dubai Mall*, businessinsider.com, Aug. 20, 2014, *available at* https://www.businessinsider.com/apple-is-

distributor for Xiaomi, the Chinese phone manufacturer, and, as part of that process, scheduled a trip to Bogota in June 2018 to meet with a Xiaomi representative.  (PSR ¶ 16).

This was Mr. Agarwal's main reason for traveling to Colombia in 2018.  Although he also met with Mr. Salazar, and this apparently was when the government's sting began, that meeting was incidental to the trip's main purpose.  (*Id.*).

During the trip, on June 5, 2018, Mr. Salazar met with Mr. Agarwal for several hours in a crowded hotel lounge in Bogota.  After these discussions, during which Mr. Salazar touted his cellphone distribution network in Colombia, Mr. Agarwal and Mr. Salazar traveled to the cities of Pastos, Ipiales and Cali over the following days to meet Mr. Salazar's customers.  All of those meetings, many of which do not appear to have been recorded, were focused on Mr. Salazar's pitch to work in Colombia for Mr. Agarwal, serving as a middleman between Mr. Agarwal and Colombian cellphone retailers and earning a share of any profits from Mr. Agarwal's sales to those retailers. Essentially, Mr. Salazar would function as Mr. Agarwal's "man on the ground" in Colombia.  (PSR ¶¶ 16-20).

### 3.    Mr. Agarwal and the CS Agree on a Payment Mechanism

In recorded conversations in June 2018, and over the ensuring months, Mr. Agarwal and Mr. Salazar discussed a mechanism through which Mr. Agarwal would be paid in the United States for the cellphones that he and Mr. Salazar sold in Colombia.  In sum, Mr. Salazar told Mr. Agarwal that he knew someone—Junior, one of the DEA undercovers—who would accept cash peso payments in Colombia and pay Mr. Agarwal in the United States via wire transfers from one of his companies.  (PSR ¶ 17).  This sounded to Mr. Agarwal like a *hawala* exchange—a payment

building-the-worlds-largest-apple-store-in-dubai-2014-8 (reporting on Apple's early stage efforts to build its first physical store in Dubai).

system that he was familiar with from his upbringing and business experience in Asia and the Middle East.  Mr. Agarwal was willing to go forward so long as the payments he received from Junior (and later his purported partner, Derrick, also a DEA undercover) were by wire and not in cash, because Mr. Agarwal believed he could not accept payment in the United States that had not been run through the banking system.

A handful of statements about that payment system (PSR ¶¶ 18, 35, 36, 48)—culled from dozens of hours of recorded conversations and thousands of text messages—appear to be the basis for the government's position that Mr. Agarwal "understood that the payments he was receiving were the proceeds of unlawful activity, and the evidence supports the inference that the defendant knew or consciously avoided knowing that the payments were the proceeds of narcotics trafficking" (PSR at 38).  Mr. Agarwal acknowledges that he had reason to believe the funds were the proceeds of unlawful activity, or were intended to promote unlawful activity, and he stipulated as much in his plea agreement in agreeing to an enhancement under U.S.S.G. § 2S1.3(b)(1)(A). (PSR ¶ 4.c.).  But the government's inference that he *must* have also known the funds were narcotics proceeds is not consistent with the evidence.

First, while Mr. Agarwal speaks limited Spanish, it is not his first or even second language. And Mr. Salazar's English (at least based on his conversations with Mr. Agarwal) can charitably be described as somewhat passable.  Indeed, in a WhatsApp message Mr. Salazar sent to Mr. Agarwal before their first meeting in Colombia, Mr. Salazar acknowledged the potential difficulty of communicating during their upcoming meetings, asking Mr. Agarwal if "You have translater [sic] person?"  At times, they also used Google translate during their conversations.  It is thus difficult to know who was understanding what from the other at any given time, particularly when their initial June 2018 meeting took place in a crowded hotel lounge.

Second, at a general level Mr. Agarwal *did* understand that Mr. Salazar's Colombian customers intended to evade import duties and taxes. This is what he meant by his multiple references to phones as "contrabando" and was the reason he was willing to consider steps such having money sent to Dubai and was willing to use a "code name" on certain invoices. But this does not demonstrate consciousness of *drug-related* money proceeds.

To the contrary, Mr. Agarwal believed the scheme would involve different types of illicit activity— regulatory evasion that, while illegal, is of an entirely different level of culpability than drug trafficking. Had the purpose of the system the DEA was proposing—to launder narcotics proceeds from the United States to Colombia—been clear from the start, Mr. Agarwal would not have agreed to participate in it. Those are not just words on paper. They are backed up by Mr. Agarwal's actions, both in the past when he refused to accept cash in the United States when couriers would not fill out Form 8300s, and in this case, when, as described in more detail below, he exited the scheme when a DEA undercover finally explained the Black Market Peso Exchange ("BMPE") to him in detail.

Third, while Mr. Agarwal generally understood that Mr. Salazar's customers might seek to pay with cash ("efectivo") via pesos *in Colombia*, the government's narcotics theory turns on the presence of cash dollars *in the United States*. (PSR ¶¶ 10-11). Mr. Agarwal, however, refused to accept cash as payment in the United States, consistent with his long-held practice of insisting on payment to his United States business via wire transfers. Mr. Agarwal was thus ignorant of the single most important element of the narcotics money laundering scheme alleged by the government: the need to move cash-based narcotics proceeds from the United States to Colombia. (PSR ¶ 10). Put simply, the government's inference is misplaced because Mr. Agarwal thought the cash was moving the other way.

Mr. Agarwal's insistence on wire-transfer payments is important to evaluating his conduct for another reason as well.  He personally has substantial experience with U.S. banks and their KYC procedures.  He has himself been subject to stringent due diligence during the onboarding process when opening a corporate account, he has been subject to ongoing account reviews by his banks, and he has been required by his banks to explain the source of funds for individual transactions.[5]  Mr. Agarwal believed that if he received payment via wire transfer, his counterparties would be subject to the same level of scrutiny.  And he further believed that if he insisted on payment via wire transfers, he could rely on the banks to protect him from risk that he was receiving illicit funds.  This may, in retrospect, seem naive; it is, in another sense, reasonable.  The account in this case into which cash was ultimately deposited and wired to Mr. Agarwal was apparently a DEA undercover account.  It is questionable whether a bank would have allowed such activity to go on in an account that was not a government account.[6]

In sum, Mr. Agarwal believed that he was being asked to engage in illicit and suspicious activity that, at most, violated Colombian import and tax laws and avoided bank scrutiny, but with no clear understanding that Mr. Salazar's customers would pay him with narcotics proceeds.

---

[5]    *See, e.g.*, Letter from Pedro Delgado, dated June 20, 2021, Ex. C at 30 (explaining that "Mr. Agarwal and Best Electronics have consistently met the expectations of ongoing due diligence and/or quickly cooperated to address potential concerns raised via a bank[']s monitoring of bank activities as well as random inspection/review of inspections.").

[6]    Indeed, in response to a defense request for *Brady* information regarding this issue, the government advised the defense that the DEA had told the bank that the "bank account was a DEA undercover account used in connection with an investigation."

**4.      The DEA Launders More than $600,000 Through Mr. Agarwal**

In the six months from June 2018 until December 2018, the DEA laundered $612,215.84 in purported narcotics proceeds through ten separate "sting transactions" with Mr. Agarwal.  (PSR ¶¶ 14, 22-32, 39-54).[7]  We say the DEA laundered the money, because that is what they did.

In each of the sting transactions, the DEA's source, Mr. Salazar, agreed to accept a contract to pick up cash in the United States and deliver pesos in Colombia; a DEA undercover courier collected the money; the DEA deposited the money in an undercover account; the DEA wired the money from that account to Mr. Agarwal as payment for cellphones; and Mr. Agarwal shipped the cellphones to Colombia to Mr. Salazar's customers, who paid Mr. Salazar with pesos in Colombia. (PSR ¶¶ 22-32, 39-54).

Importantly, Mr. Agarwal had no involvement in or knowledge of the contracts between Mr. Salazar and others.  He had no involvement in or knowledge of the money drops in the United States.  He had no involvement in or knowledge of the deposits.  And he had no involvement with Mr. Salazar's purported peso brokers.  All Mr. Agarwal knew was that he was filling orders for cellphones from Colombian customers who were paying him through a network that avoided taxes and customs duties and that provided a better exchange rate than the one provided by banks.

**5.      Once a DEA Undercover Explains the "Scheme," Mr. Agarwal Begins to Withdraw Almost Immediately.**

In late December 2018, Derrick, one a DEA undercover agents, explained the Black-Market Peso Exchange to Mr. Agarwal in detail.  Mr. Agarwal then sought to withdraw and did

---

[7]      The eleventh sting transaction described in the PSR, which is addressed in detail below, *see infra* at Section B.5., did not involve the DEA laundering money through Mr. Agarwal.  Rather, Mr. Agarwal used the DEA to complete a *hawala* transaction, obtaining the delivery of $100,000 in the United States in exchange for providing the DEA with $330,691,000 COP in Colombia that Mr. Agarwal had received from the sale of cellphones.

no further transactions with the DEA undercover agents. Indeed, Mr. Agarwal was adamant in his refusal to conduct BMPE transactions with Derrick—as Derrick later acknowledged on recorded calls. (*See* PSR ¶ 66 ("What's going on with everything, ah I was told that you didn't want to ah do business anymore . . . .")).

This sequence of events, which is described in the PSR as "Sting Transaction 11," began in mid-December 2018. Mr. Agarwal was owed roughly 330 million pesos from cellphone buyers whose purchases Mr. Salazar had facilitated. While, ordinarily, Mr. Agarwal received payment before shipping cellphones to Colombia, in this instance, during the busy holiday season, he had shipped cellphones before receiving payment and thus had money owing to him. Mr. Agarwal contacted Mr. Salazar to see if Derrick, the DEA undercover agent, could convert the money to dollars, as Mr. Agarwal understood Derrick had been doing for Mr. Salazar's customers. Derrick agreed to help. (PSR ¶¶ 55-56).

Mr. Salazar collected the pesos in Colombia and provided them to the DEA. Specifically, according to a DEA 6, on December 18, 2018, the DEA collected 330,691,000 pesos from Mr. Salazar in Colombia and converted it in Bogota to a cashier's check in the amount of $101,036.05—an exchange rate of 3,273 pesos to the dollar.

Days later, a dispute arose over the exchange rate Derrick was charging Mr. Agarwal. Mr. Agarwal, thinking Derrick was operating a *hawala*-like exchange, thought Derrick would buy his pesos at a discount but still make money on the rate he offered Mr. Agarwal to convert the pesos to dollars. He had thus accepted fewer pesos as payment for his cellphones (at effective rates of 2,900 and 2,700 pesos to the dollar) than if he was paying the official exchange rate. Derrick, playing the role of the peso broker, said he only bought *dollars* at a discount, and sought

14

to convert the pesos at the same rate the bank had charged the DEA (3,273 pesos per dollar), which would have caused Mr. Agarwal a loss. (PSR ¶ 57).

In an attempt to resolve the dispute, Derrick and Mr. Agarwal had a series of recorded phone calls in late December. It is clear that, during these calls, neither Derrick nor Mr. Agarwal could understand what the other person was talking about, illustrating the fundamental problem with the government's narcotics proceeds theory. On the one hand, Mr. Agarwal did not know why Derrick was offering the official exchange rate, because *hawala* brokers are typically cheaper than banks.[8] On the other hand, Derrick could not understand how Mr. Agarwal would think he would buy any currency other than narco dollars at a discount.

Thus, on recorded calls on December 28, Derrick asked Mr. Agarwal, "I don't think you're understanding. How long you been doing this?," to which Agarwal responded "not very long" and that the "whole idea" of using Derrick or Junior to transmit funds had been brought up by Mr. Salazar, the confidential source. (PSR ¶ 59).

The confusion culminated on a call three days later, on New Year's Eve. Derrick asked Mr. Agarwal whether he knew "where the collateral comes from," adding "you known [Salazar] for ten years and you don't know where the collateral comes from for these cell phones?" (PSR ¶ 60). Derrick then explained the black-market peso exchange to Mr. Agarwal, and stated of the money used to pay Mr. Agarwal for cellphones, "it's money from the business down south . . . with the cocoa leaves and all of that." (*Id.*).

---

[8]     As FinCEN explains, the "primary reason" to use a *hawala* broker is "cost-effectiveness" (at 9), because *hawala* brokers "offer their customers rates that are better than those offered by banks" (at 10).   *See*  https://www.assetsearchblog.com/wp-content/uploads/sites/197/2013/06/FinCEN-Hawala.pdf, at 9-10.

It is clear from the late December calls that Derrick was baffled by Mr. Agarwal's lack of knowledge about how the scheme works.  Moreover, Mr. Agarwal was similarly shocked that the money he was getting paid for cellphones allegedly came from drug proceeds.  And because he had no desire to be involved in drug-related money laundering, he ceased doing business with Derrick after this.  (PSR ¶ 61).

**6.    After Mr. Agarwal Withdrew, the DEA Kept Pressing for More Transactions.**

Nonetheless, the DEA continued to prod Mr. Agarwal for months, with Mr. Salazar begging Mr. Agarwal to do more business with him.  (PSR ¶ 63).  Mr. Agarwal repeatedly told Mr. Salazar that he did not want to do business with the proceeds of illegal activity or with the DEA undercovers (Derrick and Junior):

- February 6, 2019 — Mr. Agarwal told Mr. Salazar "we cannot accept 3rd party payments like from junior [the original DEA undercover and Derrick's purported associate]."  (PSR ¶ 63).

- February 12, 2019 — "I cannot receive wires form [sic] 3rd party like JUNIOR."  (*Id.*).

- February 25, 2019 — Mr. Agarwal reiterated to Mr. Salazar that "I don't want to receive money from somebody who is getting money from drug smuggling[,] do you understand[?]" (PSR ¶ 67).[9]

- April 25, 2019 — Mr. Agarwal messaged Mr. Salazar, "I have bene [sic] EXTREMELY clear to you. I don't want to do business with black $. I am taking part in this show to see if we can get any clients." (PSR ¶ 69).

- On May 8, 2019 — Mr. Agarwal messaged Mr. Salazar "I just want to stay away from black $[.]. I hope you understand[.] I have a family to take care of and can't get involved in this."  (*Id.*).

---

[9]    When Mr. Salazar responded "Where do you think the others are getting their money from?" and "all of those wires from DR and virtual zone are drug money too," Mr. Agarwal replied "I can only accept wires in Dubai."  (PSR ¶ 66).  But he did not finalize any transaction to receive wires in Dubai from the DEA sources or undercovers, did not open any additional accounts in Dubai or in any other country to receive such funds, and ultimately told Mr. Salazar he would not receive any wires there.

- August 15, 2019 — Mr. Agarwal messaged Mr. Salazar, "Henry there is nothing to steal[.] I can't do business with your customers. I don't accept cash[.] You know that for long time.[] And I don't accept payment from people like junior." (PSR ¶ 70).

We acknowledge that, during the first half of 2019, Mr. Agarwal raised the possibility with Mr. Salazar that he could accept money wired to accounts in Dubai. (PSR ¶¶ 63, 66-68). At this point, Mr. Agarwal was reluctant to deal further with Mr. Salazar because of Mr. Salazar's connection to the DEA undercovers, but Mr. Salazar pursued Mr. Agarwal relentlessly and essentially would not take no for an answer. In this context, Mr. Agarwal raised the possibility of conducting business with Mr. Salazar in Dubai, but he did not finalize any transaction to receive wires in Dubai from the DEA sources or undercovers and did not open any additional accounts in Dubai or in any other country to receive such funds. Ultimately, on July 7, 2019, Mr. Agarwal closed the door on the Dubai possibility, telling Mr. Salazar that his father (who lives in Dubai) "does not want to do it" and that "Banks in Dubai have got very strict." (PSR ¶ 69).

Obviously, it would have been preferable in Mr. Agarwal had done this sooner, but several contextual facts are worth reiterating. First, after the undercover explained his role in the BMPE to Mr. Agarwal in late December, Mr. Agarwal did no further transactions with the undercover. Second, the repeated Dubai references were, at least in part, the result of prodding by the undercover and Mr. Salazar. It is questionable whether, in a non-sting operation, actual criminals would relentlessly prod, for months, someone who had voiced serious reservations about engaging in criminal activity, as opposed to finding other sources to move money back to Colombia. Third, despite this prodding, Mr. Agrawal ultimately closed the door on the Dubai transaction months before his December 2019 arrest, before he even knew he was under investigation by the government.

### 7.    "Non-Sting Transaction"

The PSR describes an additional "non-sting" transaction and "other calls."  (PSR ¶¶ 33-38).  In August 2018, a friend of Mr. Agarwal's in New Jersey had told Mr. Agarwal that he owed money to an associate in Colombia.  The New Jersey friend asked Mr. Agarwal whether, if he paid Mr. Agarwal in the United States, Mr. Agarwal could arrange for payment to the friend's associate in Colombia.  The New Jersey friend then paid Mr. Agarwal $39,950 in the United States, Mr. Salazar got orders for cellphones from his customers in Colombia in an equivalent amount, and Mr. Salazar's customers then paid the New Jersey friend's Colombian associates in pesos at a rate of 2,670 pesos per dollar.  (PSR ¶ 33).

This was a pure *hawala* exchange, consistent with what Mr. Agarwal thought he was doing all along with Mr. Salazar and the DEA undercovers.  Mr. Agarwal's friend was not paying him with drug proceeds, and the government has not argued otherwise.  Instead, the parties completed the transaction because, by working outside the official financial system, they were able to agree to a better exchange rate than the official prevailing rate, which was approximately 3,200 pesos per dollar at the time.

Two of the other calls in this section of the PSR relate to proposed *hawala* transactions with the same New Jersey friend that were not ultimately completed.  (PSR ¶ 34, 37).  The remaining calls are more accurately characterized as "sting" calls, though they do not relate to any of the specific sting transactions described in the PSR.  (PSR ¶¶ 35, 36, 38).  Instead, they appear to have been selected by the government from the mountain of sting evidence in this case to support their inference that Mr. Agarwal must have known he was being paid with drug proceeds, despite the fact that he never said as much during the entire seven-month sting operation, and he stopped

dealing with the DEA undercover agents when they finally made clear that they were operating a BMPE money laundering scheme.

### 8.    The Amount of the Funds Involved in the Offense

The PSR provides that according to the government, the value of the funds attributable to Mr. Agarwal during the unlicensed money transmitting scheme is approximately $932,371.  (PSR ¶ 71).  As described above, the sting operation involved $712,215.84.  The balance appears to constitute additional transactions Mr. Agarwal had with Colombian customers where he received payment from a third party that was not the DEA.  That is, payment was made by one of Mr. Salazar's customers through a bank or money transmitter, and the money was not sent in the customer's name.

Mr. Agarwal voluntarily disclosed to the government that he had engaged in four transactions with a total value of $134,415.80 with Mr. Salazar's customers from June 2018 through April 2019 where he received payment from a third party that was not the DEA undercover account.  He also disclosed that he had identified two additional transactions totaling $45,750 from 2016 where it appeared the payer was not the same as the customer, but that he could not be certain, because the actual customer's name was not recorded.  Mr. Agarwal did not believe that any of these payments were made with narcotics proceeds, and the government has produced no evidence to the contrary.  The total value of the third party transactions Mr. Agarwal identified for the government was $182,165.80.

It appears the government may have intended to calculate the full amount of the funds involved by adding the sting transactions ($712,215.84), plus the non-string transaction it was aware of ($39,950), plus the full amount Mr. Agarwal voluntarily disclosed ($182,165.80).  This figure, however, is $935,031.64, not $932,371.  In any event, it is immaterial which amount is

correct, as it will not affect the guidelines calculations, and Mr. Agarwal has been forced to forfeit far more.

## C.    The Need to Promote the Purposes of Sentencing

Section 3553(a) calls for the Court to weigh the purposes of sentencing, including the need for the sentence to (a) reflect the seriousness of the crime, promote respect for the law, and provide just punishment; (b) afford adequate deterrence; (c) protect the public from the defendant's further crimes; and (d) provide the defendant with needed training, medical care, or other correctional services in the most effective manner.

We respectfully submit that the consequences already suffered or to be suffered by Mr. Agarwal have served as sufficient punishment for his crime, and that the other sentencing factors likewise favor a non-Guidelines, non-custodial sentence.

### 1.    Mr. Agarwal Has Already Been Punished Severely

Mr. Agarwal takes full responsibility for his conduct. He has brought shame and embarrassment not only on himself, but on his family — especially his wife. The successful business he built from scratch has been seriously wounded and will almost certainly fail if he is jailed. He has been required to forfeit roughly ***one hundred times*** more money than his actual profits from his crimes. And he will have to leave the United States and will likely be barred from returning, forcing him to either separate from his wife and son or move them from their home to India.

Mr. Agarwal's arrest and guilty plea, and the publicity that have resulted, have caused him great harm and shame. The original, public indictment in this case was headlined, in bold-faced font, "Agarwal's Trade-Based Money Laundering Scheme," an exaggerated description of the events recounted above. The government also issued a press release following Mr. Agarwal's

arrest that accused him of a BMPE scheme to launder narcotics proceeds.  *See* https://www.justice.gov/usao-sdny/pr/6-colombian-nationals-and-owner-consumer-electronics-business-charged-their-roles-money.  The United States Attorney said Mr. Agarwal ran "shadow financial networks to move drug traffickers' profits into our banking system and across our borders."  (*Id.*).  A DEA Special Agent in Charge alleged that he participated in the "global drug trade" by "moving illicit profits through our banking system."  (*Id.*).  These money laundering allegations, while perhaps applicable to the defendants charged in the other cases mentioned in the government's press releases, were ultimately inapplicable to Mr. Agarwal, as demonstrated by his eventual plea not to the money laundering sting charged in the 19 Cr. 831 Indictment, but to the money transmission conspiracy charged in the S1 19 Cr. 831 Information.  But the damage was done with the press reporting both in the United States and India that Mr. Agarwal was a money launderer for drug lords.[10]

After his plea to the lesser offense of participating in an unlicensed money transmitting business, the government issued yet another press release.  *See* https://www.justice.gov/usao-sdny/pr/owner-consumer-electronics-wholesale-business-pleads-guilty-conspiracy-operating. This release accurately stated the crime to which Mr. Agarwal pleaded guilty but otherwise went far beyond the conduct admitted to in the plea agreement, inaccurately suggesting that Mr. Agarwal had "enable[d] clients with cash located in the United States to transfer the value of that cash to other countries, principally Colombia."  (*Id.*).  The government accomplished this by repeating allegations about the purported "Money Brokers," who were charged in other cases and who

---

[10]    A sample of the news stories published following Mr. Agarwal's arrest is attached at Exhibit E.

Mr. Agarwal never met, while offering scant detail about Mr. Agarwal's actual conduct and role in the scheme.

The post-plea press release also attributed the following quote to the United States Attorney:

> U.S. Attorney Audrey Strauss said:  "As he admitted today, Amit Agarwal was a key player in a shadow financial network that allowed the movement of drug traffickers' profits into our banking system and across our borders.  Now he awaits sentencing for his crimes."

*Id.*  At his guilty plea, Mr. Agarwal did not admit he was a "key player" in anything, much less a "drug trafficking" operation, which was neither a part of his allocution nor the Information to which he pleaded guilty.

We immediately asked the government to fix the inaccuracies, but they refused, arguing that the statements "reflect the U.S. Attorney's view of the implications of the criminal conduct to which the defendant has admitted, as supported by the facts."  The email exchange is attached at Exhibit F.  With respect to the quotation attributed to the United States Attorney, the government observed:

> The U.S. Attorney's quote states that Mr. Agarwal admitted to his role in an unlicensed money transmitting business ("he was a key player in the shadow financial system") and separately that that unlicensed money transmitting business "allowed the movement of drug trafficker's profits into our banking system and across our borders"; in other words Mr. Agarwal admitted to the first clause only, and the second clause is factually correct.

(*Id.*).  While this parsing may make the quote literally true, the government's characterization of Mr. Agarwal was unfair, and the damage had, once again, been done.[11]  The characterization of

---

[11]    The confusion caused by the press release was demonstrated by *News India Times*, which published a story following the Mr. Agarwal's plea with the headline:  "Consumer electronics wholesaler in New Jersey pleads guilty to money laundering."  Although the publication eventually corrected the headline at our request to read "Consumer electronics wholesaler in New Jersey

Mr. Agarwal as an aider and abettor of drug trafficking remains on the United States Attorney's website today, and it will live on in perpetuity on the internet. As Mr. Agarwal explains, his reputation has been destroyed:

> My actions have ruined the reputation I built over many years. A local newspaper in my hometown reported on my criminal case. My international business partners read about my arrest on the internet. Since my arrest and released on bond I have been trying to rebuild my reputation, but I know it will never be the same. It is quite clear to me that America gave me great opportunity and I squandered it.

(Exhibit A at 6-7).

In addition to shame and embarrassment, the publicity has caused real harm to Mr. Agarwal's business. Raduga, a Singapore-based supplier of Xiaomi phones which previously supplied almost 1/3 of Mr. Agarwal's stock, will no longer do business with him. He lost a $2.5 million line of credit with his bank, a $1 million credit facility from an independent finance company, and corporate credit cards with a combined limit of roughly $500,000. In addition, nearly all of his working capital was frozen and is now being forfeited. He has also lost dozens of customers and vendor relationships that he had nurtured over almost two decades.

Despite these crippling blows, Mr. Agarwal has pressed on, and is working tirelessly to rebuild his business to its previous success. His was unable to return his 2020 revenue ($140 million) to its peak in 2019 ($162 million), but the fact that he has been able to continue to operate at such a level is testament to his resourcefulness and tenacity. (PSR ¶ 118). It also demonstrates that his business was not dependent in any way on the money transmission scheme, which accounted for half of a percent of his revenue in 2019.

---

pleads guilty in a conspiracy to operate an unlicensed money transmitting business," they took the position that the original headline was correct given the statements in the press release.

Mr. Agarwal is teaching his wife how to operate the business in his absence, but the reality is that it is likely to fail if he is incarcerated. As Mr. Agarwal's wife explained to the Probation Office, she "does not believe she will be able to maintain [the business] because she lacks the experience and knowledge required to keep it operational." (PSR ¶ 103). If the business fails, it will severely impact Mr. Agarwal's immediate family in the United States and extended family in India, all of whom depend on the business financially. It will also be devastating to Mr. Agarwal's four employees, two in Miami and two in New Jersey, who will lose the jobs that support them and their families.

Mr. Agarwal was also required by the government to forfeit $2,174,999.28, the amount of money that happened to be in his company's bank account when they served a seizure warrant on December 21, 2019.[12] This figure is more than two times the funds involved in the offense and 100 times the roughly $20,000 in profits that Mr. Agarwal estimates he earned from the offense conduct.[13] It is also essentially all of the equity he built up in his company over fifteen years from 2003 to 2018. As a result of the forfeiture and the damage from the publicity surrounding his arrest, Mr. Agarwal has truly started over from scratch.[14]

But by far the most serious consequence of Mr. Agarwal's conviction is his certain return to India and uncertain ability to come back to the United States. Mr. Agarwal had no legal status

---

[12]    The bank sent a total of $2,607,617.07 to the government from Mr. Agarwal's corporate account, but the government ultimately returned $432,618.50 that was seized outside the time period permitted by the warrant.

[13]    As noted above, the amount of funds involved in the offense were themselves driven largely by the DEA undercover and confidential source in the context of the sting operation.

[14]    After extensive discussions with the government, Mr. Agarwal agreed to this amount as part of his plea agreement, and he does not challenge the legal basis for it here. We emphasize the size of the forfeiture amount, however, given that it is directly relevant for purposes of sentencing, in particular in assessing the need under 18 U.S.C. § 3553(a), for the sentence imposed to provide any additional degree of punishment and to reflect the seriousness of the offense.

at the time of his arrest.  After voluntarily leaving the United States (and separating from his family temporarily), when his visa status expired in March 2019, he was paroled into the country for purposes of this prosecution.  While here, Mr. Agarwal's long-pending immigrant visa petition (which will result in a green card) was approved, but he will be required to return to India following the completion of his sentence.  As explained above, his odds of being permitted to come back to the United States are slim, and it may be years before he can even try.   If he is unable to return, he will have a difficult choice:  remain in India without his wife and two children (both of whom are United States citizens and have only ever lived in the United States), or uproot his family and move them to India.

Even if they are able to return to India as a family, the effects will have been and will be profound.  As Mr. Agarwal's wife writes:

> If he is sentenced to jail, there is good chance that his status won't be extended, and he might get deported once he serves his jail term. We recently got our green card approval notice in January 2021. So not only our American dream would shatter completely, but our kids would also be dragged in this and will have to leave the country. They are American born citizens but would be deprived of living in America due to us at least till they are adults to make their own life.

(Exhibit B at 3).

Mr. Agarwal likewise explains the way that his arrest and conviction have already affected his family, and served to punish him:

> As a result of my actions, I will have to return to India, and I don't know when I will be able to return. If I cannot come back immediately, my family will join me in India, and my two American sons will have a painful adjustment to a new country. My wife, who loves America, feels heartbroken as well. We will likely lose everything we built here. Through my crimes, I disgraced our family name which was untarnished until my arrest. The shame and stigma will follow me for the rest of my life. I take full responsibility for these consequences.

(Ex. Exhibit A at 7).

Having to leave the country they love and call home is a significant punishment for Mr. Agarwal and his entire family; indeed, knowing that his actions may cause his sons not to be raised here is the most significant punishment that has been or could be imposed on Mr. Agarwal.

### 2.    The Purposes of Deterrence Have Been Served

A custodial sentence is not necessary to afford adequate deterrence. As to individual deterrence, as described above, Mr. Agarwal and his family have already suffered so much by virtue of his crime that there is no need for incarceration to assure that he is deterred from future crimes. As Mr. Agarwal explains, "I don't blame anybody but myself for this situation. I fully understand the pain and suffering I cause my parents and my wife for no fault of their own. I made a terrible decision in this case." (Exhibit A at 7). He will "devote the rest of [his] life to making amends for [his] conduct." (*Id.*).

The severe consequences that have befallen Mr. Agarwal—a felony conviction, severe damage to his business, a $2,174,999.28 forfeiture judgment, public humiliation, and ultimately removal from the country—will more than adequately deter others from committing a similar offense. The forfeiture judgment is a particularly powerful deterrent, given that it is 100 times the profits he derived from the offense. Indeed, any other businessperson considering additional profits from operating outside the standard banking system would be hard pressed to ignore Mr. Agarwal's example.

### 3.    There Is No Need to Protect the Public from Mr. Agarwal

Mr. Agarwal poses no risk of recidivism. He has also taken many substantive steps to ensure that his business can never be used to facilitate an unlicensed money transmitting operation, including the initiating of rigorous compliance procedures consistent with those required of financial institutions by the Bank Secrecy Act. (Exhibit A at 6). The suffering and embarrassment

his crimes have caused not only to him, but to his family and friends, will also ensure that he does not re-offend.  Despite those consequences, as the attached letters demonstrate, Mr. Agarwal is surrounded by family and friends who will ensure that he does not go astray again.   This is not a situation in which a sentence of imprisonment is necessary to protect the public from Mr. Agarwal.

### 4.    Mr. Agarwal Does Not Need Treatment

Pursuant to section 3553(a)(2)(D), the Court must also consider the need for any sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  This does not apply to Mr. Agarwal, who is physically and mentally healthy.  He also does not need vocational training, and the services available to Mr. Agarwal through incarceration would not serve to rehabilitate him.  Instead, being able to provide for his family and prepare for his return to India would have the greatest rehabilitative force, whereas a term of imprisonment would "wreak extraordinary destruction" on those who depend on him.  *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992). *See also United States v. Huerta*, 371 F.3d 88 (2d Cir. 2004) (finding extraordinary family circumstances where defendant was sole caregiver to child); *United States v. Kon*, 05 Cr. 271 (RWS), 2006 WL 3208555 (S.D.N.Y. Nov. 2, 2006) (imposing sentence of time served (one day) to drug offender with Guidelines of 30-37 months in light of defendant's parental responsibilities); *United States v. Roberts*, 01 Cr. 410 (RWS), 2005 WL 1153757 (S.D.N.Y. May 16, 2005) (imposing sentence of time served (one day) to drug offender with Guidelines of 10-16 months in light of defendant's responsibilities to care for his life partner).

### 5.    The Kinds of Sentences Available

The Court must also consider the "kinds of sentences available." 18 U.S.C. § 3553(a)(3). In this case, we respectfully submit that alternatives to incarceration—such as home confinement,

27

community service, and the like—would best serve the purposes of Section 3553 and the interests of justice.  U.S.S.G. §§ 5F1.2, 5F1.3.  Indeed, home confinement would be a meaningful punishment because it would severely restrict the activities that Mr. Agarwal enjoys on a daily basis, but would still allow him to remain with his family and continue to operate his business and provide funds for his family while they are still here—a responsibility that currently falls solely upon Mr. Agarwal, as his wife is the sole caregiver for their two boys.

### E.    The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires the Court to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records" who have been found guilty "of similar conduct."  This factor weighs heavily in favor of a non-custodial sentence.

This case involves a defendant with no criminal history, who over a period of a few months used his business to facilitate the movement of funds from Colombia to the United States outside of ordinary banking channels.  All of this occurred as part of a sting operation that was apparently intended to dismantle a BMPE network.  (PSR ¶ 1).  But Mr. Agarwal had no understanding of the BMPE, or the role that exporters play in it.

It is frankly the case that most similar defendants are not charged criminally at all.  For instance, the government has allowed civil resolutions of money laundering cases of greater seriousness than the circumstances presented here:

- *Jing Min Shin and Heebok Shin*: The Shins were jewelry merchants who were exporters in a BMPE scheme.  Hundreds of thousands of dollars were deposited into their bank account from locations around the country, even though their business solely operated out of Los Angeles.  The government brought a civil forfeiture action, seizing $776,000 in their bank account.[15]  We have found no record that the Shins were ever criminally

---

[15]    *See United States* v. *$776,670.00 previously contained in Bank of Am. account number 000376803507 held in the name of Shin's Trading, DBA Cala Prod.,* No. Civ. 2:13-4108 WJM, 2014 WL 1669929, at *4 (D.N.J. Apr. 28, 2014).

prosecuted for this conduct. Unlike the Shins, Mr. Agarwal refused to accept bulk cash proceeds and instead insisted on receiving wire transfers.

- *Cellular Next*: Agents observed bulk cash deliveries to Cellular Next, a Miami-based wholesale phone distributor, and other evidence indicated Cellular Next received hundreds of thousands of dollars in cash to ship cellphones to Colombia. While the government initially seized $1.7 million from a Cellular Next bank account (half of which was ultimately returned to Cellular Next), our understanding is that no Cellular Next employees were ever charged criminally.[16]

- *Marcia Holman*: Ms. Holman operated Skycell Trading LLC, a Miami-based electronics exporter. Over a six-month period, Skycell's bank account received 39 suspicious cash deposits from locations throughout the United States. While, again, the government seized Skycell's bank account, we have found no evidence that Holman was ever criminally prosecuted.[17]

- *VA Cell*: State and federal authorities seized approximately $1.6 million of cash from a Miami-based cellphone exporter, VA Cell (ultimately returning almost 40% of it to the company).[18] Most of that money was seized following an undercover operation in which agents made 17 deliveries of cashier's checks to VA Cell, totaling almost $1.5 million, and a VA Cell employee lied to the agents about having received that money. However, we have found no evidence that anyone at VA Cell was ever criminally charged.

The fact that Mr. Agarwal has been charged and convicted criminally—and been subject to all of the attended consequences of conviction, including almost surely losing any chance at legal residency in the United States—is therefore by itself a significant measure of punishment that is not meted out to most people in his situation.

---

[16]    *See* Verified Complaint in Rem, *United States* v. *$1,742,289.43 in United States Currency Previously contained in Citibank Account Number 4972573187 Held in the Name Cellular Next, LLC*, No. 14 Civ. 4006 (WHW) (D.N.J. 23, 2014).

[17]    Verified Complaint in Rem, *United States* v. *$70,410.54 Seized from Citibank Account Ending in n 9259 Held in the Name of Skycell Trying*, *LLC, Defendant in rem.*, 2011 WL 9171844 (E.D.N.Y. Oct. 24, 2011).

[18]    *See* Verified Complaint/Petition for Judgement of Forfeiture, *In re Forfeiture of Bank of America, N.A. Account XXXX Funds Up to An Amount of $1,749,868.00*, (11th Judicial Circuit, Miami-Dade County May 9, 2016); *see also* Verified Complaint in Rem, *United States* v. *Approximately Two Hundred Twenty-Six Thousand Four Hundred Fifteen Dollars and Forty-Four Cents, et al.*, No. 13 Civ. 4464 (KAM) (CLP) (E.D.N.Y. Aug. 7, 2013).

But his conduct was undeniably criminal, and there are relevant criminal sentences to evaluate. While there are not many sentences under Section 1960 to compare, a non-custodial sentence is consistent with the punishment imposed in this and other districts to money transmission defendants in similar—and indeed in more serious—circumstances:

- *United States v. Foncillas*, 18 Cr. 460 (S.D.N.Y.) (Daniels, *J.*): The defendant pleaded guilty to a § 1960 offense, after he "used a company he owned to open bank accounts in the United States and facilitate the transmission of at least approximately $9 million between the United States and Mexico." Gov't Sentencing Submission, *United States* v. *Foncillas*, 18 Cr. 460, ECF No. 11 at 2. At sentencing, the government advised Judge Daniels that it had "identified narcotics activity that, in part . . . gives rise to this money." Sentencing Transcript, *United States* v. *Foncillas*, 18 Cr. 460, ECF No. 13 at 13. Judge Daniels sentenced the defendant to no jail time and two years' supervised release. Judgment, *United States* v. *Foncillas*, 18 Cr. 460, ECF No. 13 at 1-2.[19]

- *Unites States v. Ong*, 17 Cr. 191 (W.D. Wash.): The defendant accepted bulk cash payments for bitcoins after being told by undercover agents that the cash had been generated from illegal activities, including drug trafficking. Gov't Sentencing Submission, *United States* v. *Ong*, 17 Cr. 191, ECF No. 45 at 1-3. The defendant charged a 9% fee and accepted a total of $311,000. *Id.* He was sentenced to no jail time and three years' supervised release. Judgment, *United States* v. *Ong*, 17 Cr. 191, ECF No. 52 at 2.

Where sentences of incarceration are imposed for unlicensed money transmission, it is typically in cases where there was also a conviction of a more serious money laundering offense or the conduct at issue was substantially more serious than that presented here:

- *United States v. Luis Diaz, Jr. and Luis Javier Diaz*, 17 Cr. 077 (S.D.N.Y) (Pauley, *J.*): A father and son were convicted after trial of using their family owned business, Miami Equipment & Export Co., to operate an unlicensed money transmitting business that sent over a hundred million dollars to individuals and entities around the world, including shell companies, Venezuelan government officials, and others with whom Miami Equipment had no bona fide business relationship. Gov't Sentencing Submission, *United States v. Luis Diaz, Jr. and Luis Javier Diaz*, 17 Cr. 077, ECF 97 at 1-4. The defendants also charged fees for this service, amounting to over a million dollars during the relevant period. *Id.* The guidelines range for both defendants was 155 to 188 months' imprisonment. *Id.* at 6. Judge Pauley sentenced the father to four

---

[19]    In *Foncillas*, the defendant stipulated to the imposition of a $9.4 million money judgment equal to the total funds involved in the offense, but the government agreed "that such money judgment shall be satisfied by a payment of $262,267.62," approximately three percent of the amount of the money judgment.

months in prison and the son to eight months in prison. Judgments, *United States v. Luis Diaz, Jr. and Luis Javier Diaz*, 17 Cr. 077, ECF Nos. 108, 110.

- *United States v. Theresa Tetley*, 17 Cr. 738 (C.D.C.A.): The defendant was sentenced to 12 months and one day after pleading guilty to one count of operating an unlicensed money transmitting business and one count of money laundering for offering bitcoin-for-cash exchange services, exchanging between $6-$9.5 million for customers across the country and laundering bitcoin that was represented to be the proceeds of narcotics activity. *See* https://www.justice.gov/usao-cdca/pr/bitcoin-maven-sentenced-one-year-federal-prison-bitcoin-money-laundering-case.

- *United States v. Yisroel Malamud*, 17 Cr. 61 (D.N.J. March 28, 2018): The defendant pleaded guilty to violating 18 U.S.C. § 1960 by running an unlicensed money transmitting business through which he would receive money, deposit it into bank accounts he maintained in the name of different entities, and then transmit it to third-parties in exchange for a fee. He processed over $6 million through his money transmitting business and was sentenced to 21 months in prison. *See* https://www.justice.gov/usao-nj/pr/ocean-county-new-jersey-business-owner-sentenced-21-months-prison-operating-unlicensed. The government agreed to forfeiture in the amount of $120,000. Judgment and Order of Forfeiture, *United States v. Yisroel Malamud*, 17 Cr. 61, ECF No. 23.

## F.    There Is No Need for Restitution and, Given the Forfeiture Amount, No Further Financial Penalty is Warranted

Finally, section 3553(a)(7) directs the Court to consider "the need to provide restitution to any victims of the offense." This was a sting case with no victims for restitution purposes. Accordingly, the PSR notes that restitution is not appropriate. (PSR ¶¶ 137-38).

Mr. Agarwal has nevertheless agreed to forfeiture of $2,174,999.28. As explained above, this is the amount that happened to be in his corporate bank account at the time the government served Best Electronics' bank with a seizure warrant.

The PSR also recommends a $50,000 fine. While the Probation Department recognizes that Mr. Agarwal "has already received some penalization for his conduct, in that he agreed to forfeit a substantial amount of funds tied to his business," it does not explain why a fine is also warranted, except to note that Mr. Agarwal "appears able to pay a fine." (PSR at 43). We respectfully submit that in light of the stipulated forfeiture amount, which requires Mr. Agarwal

to pay nearly one hundred times the amount he realized in real dollars as a result of his unlawful money transmission, this Court should not impose any additional financial burdens on Mr. Agarwal's family. *See United States v. Madden*, 09 Cr. 799 (RWS), 2011 WL 4359933, at *3 (S.D.N.Y. Sept. 19, 2011) ("In consideration of the significant amount of restitution and forfeiture Defendant will be paying, the fine in this case shall be waived.").

## CONCLUSION

For the reasons set forth above, we respectfully submit that consideration of the relevant sentencing factors results in a non-custodial sentence.  A sentence of time served, to be followed by a supervised release with conditions of home confinement and community service, would serve as just punishment.

Mr. Agarwal's conduct was wrong, but it was plainly out of character. There is no chance of recidivism.  He is deeply ashamed of his conduct and has taken every action to accept responsibility for his crimes.  He has begun to heal the damage that has been caused to his family, who have forgiven and support him.  Their next challenge—one brought upon the family solely as a result of Mr. Agarwal's crimes—will likely be to leave the country they love and return to India, where the family will have to rebuild their lives in every sense.  We respectfully submit that sending Mr. Agarwal to prison, which may require his wife and sons to relocate without him, would impose a punishment that would fall disproportionately on them and would serve no rehabilitative or other legitimate purpose as to Mr. Agarwal.

Dated: June 30, 2021

*S/ Peter M. Skinner*
Peter M. Skinner
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York  10001
(212) 446-2300
pskinner@bsfllp.com

Brendan F. Quigley
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, N.Y. 10112
212 408 2520
brendan.quigley@bakerbotts.com

*Attorneys for Amit Agarwal*

## <u>INDEX OF EXIBITS</u>

A.      Letter to the Court by Amit Agarwal

B.      Letter to the Court by Sonal Dugar, Mr. Agarwal's wife

C.      Letters to the Court by Mr. Agarwal's family, friends and colleagues

D.      Objections to Presentence Report, dated May 3, 2021

E.      News Stories Published Following Mr. Agarwal's Arrest

F.      Post-plea email exchange between the government and Mr. Agarwal's attorneys