

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 7, 2021

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Court Judge
40 Foley Square
New York, NY 10007

  Re: *United States v. Amit Agarwal*, No. 19 Cr. 838 (PAE)

Dear Judge Engelmayer:

  The defendant, Amit Agarwal, is scheduled to be sentenced on July 14, 2021, at 2:30 p.m. The Government makes this submission in advance of sentencing. For the reasons set forth below, the Government submits that a sentence within the Guidelines range stipulated in the parties' plea agreement, namely 30 to 37 months' imprisonment, is appropriate in this case.

## I.  Offense Conduct

  The DEA's investigation into the defendant began when the DEA was investigating a money laundering an unlicensed money transmitting network known as a Black Peso Market Exchange ("BPME") used by Colombian drug cartels. (PSR ¶ 10). When using the BPME system, Colombian cartels sell U.S. currency that are drug trafficking proceeds to money brokers in Colombia, who in turn contract with Colombian importers who use the U.S. currency to purchase foreign goods, and the Colombian importers then pay the money brokers in pesos based on an agreed upon unofficial exchange rate. The Government does not take the position that the defendant understood or knew about the specifics of the BPME scheme. But, consistent with the defendant's guilty plea, the defendant understood that he was conspiring with others to participate in the conduct of unlicensed money transmitting business. In addition, as discussed further below, the facts show that the defendant understood, or at a minimum consciously avoided knowing, that the payments he was receiving were drug trafficking proceeds based on the representations made to him by a confidential source and undercover agent. Moreover, the evidence shows that the defendant understood that, at least at times, the unlicensed money transmitting network operated to transfer funds from the United States to Colombia through the purchase and export of cellphones from the United States to Colombia.

  The defendant is the CEO of Best Electronics USA ("Best Electronics"), a wholesale consumer electronics business based in New Jersey that exported consumer electronics to purchasers throughout the world, including Colombia. (PSR ¶ 12). The DEA conducted its

investigation into the BPME unlicensed money transmitting and money laundering network with the assistance of a confidential source (the "CS") based in Colombia who had been in the wholesale cellphone business for approximately twenty years. (PSR ¶ 10). The CS had a business relationship with the defendant that pre-dated the DEA's investigation; between approximately 2010 to 2012, the CS purchased cellphones from Best Electronics for export to Colombia. (PSR ¶ 15). During this time, the CS and two other Colombian customers paid the defendant in cash through associates in the United States, and, although the defendant stopped doing business with the CS for a period of years because the defendant no longer accepted cash payments, it was in part because the defendant previously accepted cash payments that the DEA began its investigation into the defendant. (*Id.*).

*Initial Meeting*

On June 5, 2018, while on a business trip in Colombia, the defendant met with the CS at a hotel in Bogota, Colombia. (PSR ¶ 16). The meeting was audio recorded. (*Id.*). The CS and the defendant discussed doing business again together in Colombia, and the defendant and the CS agreed that the CS would act as the defendant's agent in Colombia to source customers for cellphones in Colombia. (*Id.*). At this first meeting, both the CS and an undercover agent posing as the CS's associate named "Junior" explicitly told the defendant that the payments the defendant would receive to purchase cellphones from the defendant would be the proceeds of narcotics trafficking. (PSR ¶¶ 16-18).

Specifically, early in the meeting, the defendant asked whether the customers would pay for the cellphones in cash, and in response, the CS and the defendant had the following exchange in English (emphasis added):

> CS: I, I have one client, I can good price in the…the U.S. dollars. This money is uh…*illegal money. It's, it's narcotraffic money*.
> Agarwal: I don't know.
> CS: This is real. This is a good opportunity for dollar more cheaper and…
> Agarwal: But in, in Miami, in USA, they pay "efectivo"[cash]. Or they pay…?
> CS: Uh, cash or, or…I don't know, maybe…he speak English. Is possible I will tell you, one moment . . . .
> Agarwal: Is it possible to send money by bank
> CS: Very expensive

(PSR ¶ 16).

Subsequently during the same meeting, the CS introduced the defendant to Junior on a recorded call so that Junior could facilitate payments to the defendant from the CS's customers because the defendant would not accept cash payments from the customers. (PSR ¶ 17). During this introduction, the CS, Junior, and the defendant discussed that Junior would pay the defendant via wire transfer from a U.S. based third-party company. (*Id.*). The defendant expressed no concern at this arrangement, and instead confirmed that the payments would be coming from a "generic" company name so that the transactions would not look suspicious ("but the name is

generic, right? I mean, it could be ABC Trading [ . . . ] because you know, if it says ABC Electricians, or something, why am I getting 50,000 dollars from electricians, you know?"). (*Id.*).

The CS and the defendant called Junior again during the June 5th meeting. (PSR ¶ 18). The defendant again emphasized that the payments to the defendant's bank account should be made from a generic company ("as long as it doesn't say anything, you know? Like it just says trading or something like generic."). (*Id.*). Junior responded by reiterating to the defendant that the payments were coming from drug traffickers, stating (emphasis added): "Yeah, that's, that's correct. So, [CS], [CS] *will tell me where to go pick up the money from the, the "narcos"* and stuff like that, and so once I get the money, then you'll tell me which accounts and, and then we'll send the money through the bank electronically [. . .]." (*Id.*). Again, the defendant asked no further questions and expressed no hesitation in response to this informaiton that the payments were coming from drug traffickers. The defendant deliberately chose to turn a blind eye to the information, stating (emphasis added), "*I mean, that's really your business*, but I just want to make sure that I get money in the bank, uh… because you would have to deposit the money in, in an account and then transfer me from an account." (*Id.*). The defendant was not concerned about receiving payments from drug traffickers but only that he might not receive his payments or that he might get in trouble, stating (emphasis added), "*I just don't want anything to come back to me* but, who knows, right? I mean you guys close these companies frequently also?" (*Id.*). Moreover, concerned about getting caught accepting payments from drug traffickers, the defendant suggested that Junior send the wire transfers to the defendant's Dubai companies instead of his U.S. bank account because "Nobody is looking in Dubai." (*Id.*).

After the second call with Junior, the CS and the defendant continued the June 5th meeting. (PSR ¶ 19). The CS told the defendant that the Colombian cellphone customers would be purchasing the cellphones with cash and that some of the customers had cash in Miami. (*Id.*). This information shared with the defendant is consistent with the CS's and undercover agent's representations to the defendant that the cellphone payments would come from drug traffickers. The CS's statement that some of the customers had cash in Miami also shows that the defendant was informed that, at least at times, the customers had cash in the United States instead of Colombia. The defendant's own statements indicate that he understood the payments for the cellphones were connected to drug trafficking when he told the CS that five years before a Colombian customer had paid the defendant $200,000 in U.S. currency in a shoe box, and in that context, the defendant stated *the DEA is a big problem in Miami*. (*Id.*).

Over the next two days, the defendant and the CS travelled within Colombia so that the CS could introduce the defendant to potential cellphone buyers. (PSR ¶ 20). On June 7, 2018, the CS introduced the defendant to Miguel Cespedes, a cellphone purchaser and Money Broker later charged in connection with this investigation in *United States v. Miguel Cespedes*, 19 Cr. 839 (GHW). (PSR ¶¶ 6, 20). During the audio-recorded meeting, the defendant stated that he could accept wires or cash in Dubai, and Cespedes explained that he could make payments to Dubai from Paris, Barcelona, Madrid, Hong Kong, and Mexico, and he mentioned that he had $150,000 USD

3

in New York.[1] (PSR ¶ 20). This conversation shows that the defendant knew that at least at times the cellphone customers had cash in the United States instead of Colombia. It also shows that the defendant was only reluctant to accept cash payments in the United States and not in Dubai, where there was less oversight, as the defendant stated several times during the investigation.

*The First Ten Sting Transactions*

Not long after the June 5th meeting, the defendant began participating in the conduct of the unlicensed money transmitting network. Over the course of approximately seven months, between June and December 2018, the DEA conducted a series of ten sting transactions totaling over $600,000 involving the defendant and various Colombian money brokers. Specifically, with the assistance of the CS, the DEA identified several money brokers in Colombia operating an unlicensed money transmitting network to transfer suspected narcotics proceeds primarily from the United States to Colombia. (PSR ¶ 11). The money brokers offered multiple contracts to the CS to coordinate the pick-up of U.S. currency from couriers throughout the United States and to convert the U.S. dollars to Colombian pesos at an unofficial or "black market" exchange rate. (*Id.*). The CS, working at the direction of the DEA, accepted contracts offered by the money brokers and, pursuant to those contracts, arranged for couriers to deliver that cash to law enforcement officers acting in undercover capacities and who posed as the CS's agents. (*Id.*). The CS and the money brokers executed the contracts by using the funds that were the subject of the contracts to purchase cellphones from the defendant's Best Electronics business. (PSR ¶ 13). The defendant received the payments for the cellphones via wire transfers from a bank account controlled by the DEA. (*Id.*). The defendant exported the cellphones to Colombia either directly to the money brokers, who then sold the cellphones for pesos, or to other Colombian based electronics wholesalers, who paid the CS in pesos for the cellphones, and the CS delivered the pesos to the money brokers. (*Id.*). Both the money brokers and the CS took commissions for executing these contracts by pocketing the difference of the unofficial exchange rate offered to collect the U.S. Currency on the one hand and to accept pesos on the other. (*Id.*). The details of these ten sting transactions are set forth in the Presentence Report. (PSR ¶¶ 22-32, 39-54).

The Government does not take the position that the defendant knew about the money contracts, cash pickups, or details of the BPME scheme. The contracts and cash pickups were coordinated between the CS, the money brokers, and DEA undercover agents. However, as the defendant admitted during his guilty plea, he understood that by participating in these sting transactions, he was participating in an unlicensed money transmitting business.

In addition, although the defendant did not understand the details of the BPME scheme, the defendant understood that the unlicensed money transmitting business used an unofficial exchange rate and that at least at times the money transmitting network was operating to transmit funds from the United States to Colombia. For example, over the course of the investigation, the defendant periodically suggested to the CS that, given the problems with the reliability of Junior's ability to transmit payment for the cellphones to the defendant in the United States, the

---

[1] This conversation took place primarily in Spanish, but the portion summarized here reflect Agarwal's own statements and statements made by Cespedes translated into English by the confidential source for Agarwal.

defendant could instead receive payment from his friend in New Jersey for the cellphones.[2] (PSR ¶¶ 33, 34, 47). The CS would when then receive payment in Colombian pesos for the cellphones from the Colombian customers at an unofficial exchange rate, and the CS would then provide that payment in Colombian pesos to the Colombian contact of the defendant's friend. (*Id.*). Although the defendant and the CS discussed this possibility several times between approximately June and December 2018, the defendant and the CS engaged in one such transaction. (*Id.*). On August 10, 2018, the defendant informed the CS via WhatsApp that the defendant's friend would send the defendant $39,950 USD to the defendant's U.S. bank account and that his friend agreed that the friend's Colombian contact would receive Colombian pesos in cash at the unofficial rate of $2,670 COP/USD from the CS. (*Id.*). The next day, over WhatsApp, the CS informed the defendant that he had orders for cellphone products from two Colombian customers worth $39,950 USD and that those customers would pay the CS in pesos for the cellphones. (*Id.*). The defendant provided the CS with the name and telephone number of his friend's Colombian contact. (*Id.*). The CS received payment in Colombian pesos from the Colombian cellphone purchasers, and on August 13 and 14, 2018, he provided the pesos in cash to the contact of the defendant's friend. (*Id.*). The defendant proposed a similar transaction from $300,000 - $400,000 on September 20, 2018, although it ultimately did not take place. (PSR ¶ 37). The August 10 transaction transaction and similar conversations show that the defendant transferred funds from the United States to Colombia on behalf of his friend by exporting cellphones and negotiating an unofficial exchange rate. It is reasonable to infer that the defendant understood that, at least at times, the other transactions he was conducting with the CS and Junior were operating in a similar fashion to transfer funds from the United States to Colombia.[3]

Although neither the CS nor the undercover agents made additional explicit representations to the defendant that the payments were from drug traffickers until the end of the sting transactions, they did make additional representations to the defendant that were consistent with their prior representations that the payments were from drug traffickers. Specifically:

- During a recorded call on September 12, 2018, another agent acting in an undercover capacity posing as "Derrick," Junior's boss, told the defendant, "[W]e pick up the money and we do whatever we need to do to get it back down south, to the people down south, however the money comes, you know." (PSR ¶ 35).

---

[2] The Government has not confirmed the identity of this individual.

[3] The Government notes that there is additional evidence, reflected in the Presentence Report, consistent with the defendant's understanding as represented in his sentencing submission, that the unlicensed money transmitting network was operating to transfer funds from Colombia to the United States. The Government's position, however, is that there is other evidence, as discussed herein, that shows that the defendant understood that at least at times time unlicensed money transmitting network was operating to transfer funds from the United States to Colombia. In addition, it is the Government's position that it is not necessary for the Court to reach that conclusion in order to determine that the defendant knew or consciously avoided knowing that the payments were narcotics trafficking proceeds based on the representations made to him by the CS and undercover agents.

> The defendant responded, in part, I "don't know how this whole thing works and I don't want to know." (*Id.*).

- On September 18, 2018, the CS told the defendant via WhatsApp, "Now I tell you about my plan. Colombia is a good market, but customers want to pay with dirty money from Mexico and other countries," and the defendant responded via WhatsApp, "Yes I know." (PSR ¶ 36).
- In October 2018, the defendant expressed to Derrick that he was "a little bit nervous" if his bank questioned him why he was receiving payments from Derrick and Junior's company. (PSR ¶ 43).
- On November 2, 2018, Derrick represented to the defendant that the money Derrick and Junior sent to the defendant did not come from Colombia but instead that "a lot of it comes from around . . . the streets" in places such as Chicago, Los Angeles, and at times from Mexico. (PSR ¶ 48).
- On December 12, 2018, via WhatsApp, the CS sent the defendant a photo of U.S. Currency with the message "Money for you" in connection with a cellphone order. (PSR ¶ 52).
- On December 13, 2018, on a recorded call, Derrick apologized for the delay in sending a $60,000 payment for cellphones, and attempted to explain that they had picked up the money in Miami and that it had taken longer to count the money because it was in "small bills." (PSR ¶ 54).

These additional representations and conversations, taken in context with the explicit representations made during the June 5th meeting, show the defendant knew or consciously avoided knowing the payments for the cellphones were from narcotics trafficking.

*The Eleventh Sting Transaction and Aftermath*

The eleventh and last sting transaction was different. In this transaction, the defendant had collected Colombian pesos in cash as payment for approximately $120,000 USD worth of cellphones that the defendant had already delivered to Colombia. (PSR ¶¶ 54, 55). The defendant requested Derrick's assistance to transfer the cash pesos as U.S. dollars deposited into the defendant's U.S. bank account. (PSR ¶¶ 54-56). A dispute arose because Derrick transferred the funds at the official exchange rate, but the defendant had entered into the transaction with the cellphone purchasers expecting on a more favorable, unofficial exchange rate and thus lost money on the transaction. (PSR ¶ 57). Over the course of several conversations regarding this dispute, the defendant expressed confusion regarding the specifics of the BPME scheme. (PSR ¶¶ 59, 60). Ultimately, on January 2, 2019, the DEA wired $1000,000 to the defendant in connection with this transaction. (PSR ¶ 61).

During these conversations regarding the exchange rate dispute, Derrick again explicitly represented to the defendant that the payments were from drug trafficking, and the defendant's response was not to stop all business with Derrick, Junior, and the CS, but to handle the payments through Dubai, where there was less regulatory oversight. Specifically, on a recorded call on December 31, 2018, Derrick told the defendant that the "cash in America" was "money from the business down south [pause] with the cocoa leaves and all of that." (PSR ¶ 60). Moments later during the same conversation, the defendant said, "I'm a bit nervous in the future

6

about you wiring me, I'd rather have you, can you wire from Mexico directly to Dubai." (*Id.*). The defendant asked, "But are you not concerned about like IRS or like somebody looking over at things like that or are you, or no?" and subsequently reiterated that "in the future, I mean, I was thinking of just accepting wires in Dubai, not over here." (*Id.*).

Nor did the defendant stop doing business with the cellphone purchasers sourced by the CS, who would later be indicted for their role as money brokers. On January 9, 2019, the CS participated in a group WhatsApp chat with the defendant, Ivan Rojas, and Alex Barrera in which the defendant provided information for a bank account in Dubai in order for the defendant to receive wire payments in Dubai. (PSR ¶ 62). On January 24, 2019, the defendant sent the CS via WhatsApp a photo of wire transfers dated January 24, 2019 totaling approximately $85,000 USD received in the defendant's Dubai account,[4] the defendant asked the CS whether the funds were from Rojas or "Valentino" a/k/a Barrera. (PSR ¶ 63).

Although the defendant did not conduct more transactions with the CS, Derrick, or Junior, for two months the defendant continued to express his willingness and interest to accept payments in Dubai instead of the United States in order to avoid the scrutiny of U.S. financial regulators and law enforcement. For example:

- On January 25, 2019, the defendant wrote the following to the CS via WhatsApp: "Also with Derrick I cannot receive money from him in USA must be in Dubai. I checked with my lawyer he said receiving money from 3rd party in USA can be risk for me. So I think best to find customers who can wire directly to Dubai. This way we don't bring Derrick in between." (PSR ¶ 64).
- On February 2, 2019, the defendant, via a WhatsApp message, told the CS that "We may have a problem in Dubai as well. In Dubai they are getting very strict and closing accounts – my Dubai guys just told me yesterday. If Dubai [account] closes then I think we cannot continue this business with you guys who want to pay black $," and the defendant messaged "please delete this conversation from your phone I feel uncomfortable I think I mentioned many things." (PSR ¶ 65).
- On February 14, 2019, on a recorded call, the defendant asked Derrick if Derrick could send wires to the defendant in Dubai instead of the United States and explained that even in Dubai, authorities were getting stricter to verify payments. The defendant explained that "he doesn't want anyone knocking on his door" because of his transactions with Derrick and "U.S. people can't really go to Dubai" and noted that "a lot of people do that, from Mexico the money goes to Hong Kong. I am sure you know that." (PSR ¶ 66).
- On February 25, 2019, the CS wrote via WhatsApp to the defendant, "All of those wires from DR and virtual zone are drug money too," and the defendant later responded, "I can only accept wires in Dubai." (PSR ¶ 67).
- On March 13, 2019, in a recorded meeting with the CS, the defendant stated, "This is the problem I spoke to my lawyer [UI] I'm not selling to them, I'm selling to Colombia and he [the undercover] is taking money from a

---

[4] The Dubai account was not held in the name of the defendant or Best Electronics but in the name of another business.

      narcotraffico." The defendant subsequently stated, "In America there are people who don't want this to happen, so what they do is, they will freeze my bank account." The defendant explained that other electronics wholesalers had bank accounts abroad in places such as Dubai and Hong Kong in order to accept payments. The defendant asked whether Derrick could send money to Dubai instead of the United States. The defendant noted that Valentino a/k/a Barrera was able to send money to Dubai and perhaps could send payment to the defendant in Dubai going forward. The defendant cautioned that Dubai was getting stricter and that the authorities there were also watching. That same day, the defendant told Derrick on a recorded call that the defendant was willing to continue doing business with Derrick so long as Derrick could wire the funds to Dubai. (PSR ¶¶ 68, 69).

- On March 20, 2019, in response to a WhatsApp message from the CS regarding a cellphone purchase order, the defendant said that he could proceed if the customer sent the money to Dubai because "for now Dubai is ok – I don't know for how long will be ok." (PSR ¶ 70).

By April 2019, the defendant stopped expressing interest in accepting payment in Dubai and refused to conduct any further transactions with the CS, Derrick, or Junior. (PSR ¶ 69). Around this time, in July 2019, the defendant informed the CS that "Banks in Dubai have got very strict," *id.*, suggesting that the reason the defendant ultimately did not pursue transactions through Dubai was because he was afraid he would be caught by enforcement authorities there.

## II. Procedural History

On November 19, 2019, a grand jury in this District returned an indictment charging the defendant with money laundering, in violation of Title 18, United States Code, Section 1956(a)(3)(B) and 2. On December 20, 2019, the defendant was arrested at Newark Liberty International Airport in connection with the above offense. (PSR ¶ 71). That same day, the defendant was arraigned, presented, and granted bail and he was released on bail on December 23, 2019.

On February 11, 2021, the defendant pled guilty pursuant to a plea agreement to a superseding information, charging the defendant with conspiracy to operate an unlicensed money transmitting business, in violation of Title 18, United States Code, Sections 371 and 1960(a) and (b)(1)(A). (PSR ¶ 3). Pursuant to the plea agreement dated February 8, 2021, the parties stipulated that the applicable Guidelines range is 30 to 37 months' imprisonment. On June 8, 2021, Probation issued the final Presentence Report. Probation calculated the defendant's Guidelines range to be 30 to 37 months' imprisonment, and Probation recommends a sentence of 6 months' imprisonment. (PSR 42).

### III.   A Guidelines Sentence is Appropriate in This Case

#### A. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### B. Discussion

In this case, the Government believes a sentence within the stipulated Guidelines range of 30 to 37 months' imprisonment would achieve the goals of sentencing and appropriately balance the factors considered pursuant to Section 3553(a).

*First*, a sentence within the stipulated Guidelines range is appropriate to reflect the seriousness of the defendant's conduct. Over the course of approximately seven months, the defendant participated in an unlicensed money transmitting network and executed numerous transactions totaling almost a million dollars in furtherance of the unlicensed money transmitting network. The defendant understood that he was participating in transactions designed to avoid the regulated financial system. The defendant committed the offense and compromised his morals for financial gain. The fact that the defendant was willing to commit the offense for a small financial gain relative to his thriving global business suggests that the defendant was easily corrupted. The defendants' seven-month participation in the unlicensed money transmitting network provided the

defendant with ample time to reflect on his involvement in this crime and to choose to desist from engaging in the crime.

Moreover, as described above, the facts show that the defendant knew or consciously avoided knowing the payments he was receiving were drug trafficking proceeds based on the representations made to him by a confidential source and undercover agent. Both the CS and the undercover agent explicitly represented to the defendant at the initial meeting on June 5, 2018, that payment for the cellphones were drug trafficking proceeds. The defendant's response, described above, was to ensure that the payments came from a generic company that would not draw the suspicion of banks or law enforcement and to suggest payments be made in Dubai instead, where there is less regulatory scrutiny than in the United States. The defendant's own statement during that meeting shows that the defendant understood that the payments were connected to drug trafficking. As described above, in the context of describing a prior $200,000 cash payment the defendant had received years before, the defendant noted that the "DEA is a big problem in Miami."

The defendant claims to accept full responsibility for his conduct, but the defendant minimizes his conduct by failing to acknowledge that he knew or should have known the payments were drug trafficking proceeds. In his sentencing submission, the defendant omits entirely the June 5th conversation regarding narcotrafficking proceeds. The defendant does not dispute that the conversation took place but provides no alternative explanation regarding what he understood the CS and undercover to mean when they described the payments as "illegal money. It's, it's narcotraffic money" and "money from the narcos"—or why the defendant himself mentioned the DEA in the context of receiving payments. The defendant argues generally that there was a language barrier with the CS, but the conversations described above took place in English and are easily comprehended, as made clear by the excerpted transcripts and summaries above and in the Presentence Report. The defendant further argues that he understood the payments were illegal proceeds to the extent that the CS's Colombian customers were evading Colombian import duties and taxes. Although it is true that the Colombian customers sought to evade Colombian import duties and taxes by not properly declaring the cellphone imports, that does not preclude the defendant from also understanding, or consciously avoid knowing, that the payments were derived from drug trafficking based on the representations made to him. Indeed, it makes little sense that the defendant repeatedly suggested to send payments to Dubai instead of the United States to avoid bank, regulatory, or law enforcement scrutiny *in the United States* if the defendant only believed that his customers were evading *Colombian* import duties and taxes—U.S. authorities do not enforce Colombian law, and the defendant was sufficiently sophisticated to understand that. Similarly, the defendant's argument

In addition, the defendant argues that he did not understand that the payments were narcotics proceeds because the defendant did not understand that the transactions involved cash in the United States that needed to be transferred to Colombia but instead cash in Colombia that needed to be transferred to the United States. Just because the defendant was no longer willing to accept U.S currency himself (but had previously done so) does not mean the defendant did not understand that the sting transactions involved U.S. currency—indeed, this is precisely why the defendant needed the services of Derrick and Junior. As described above and in the Presentence Report, multiple representations were made to the defendant that the transactions involved U.S.

10

currency. For example: the CS told the defendant during the June 5th meeting that some of the Colombian customers had cash in Miami, (PSR ¶ 19); Cespedes told the defendant he had $150,000 USD in New York, (PSR ¶ 20); Derrick represented to the defendant that the money Derrick and Junior sent to the defendant "comes from around . . . the streets" in places such as Chicago, Los Angeles, and at times from Mexico, (PSR ¶ 48); and the CS sent the defendant a photo of U.S. Currency with the message "Money for you" in connection with a cellphone order, (PSR ¶ 52). In addition, as described above, the defendant discussed in several instances engaging in a cellphone sale transaction that also functioned as unlicensed money transfer *from the United States to Colombia* for the defendant's friend, and the defendant engaged in one such transaction. (PSR ¶¶ 33, 34, 47). Regardless of the defendant's understanding of the direction of the money flow or the involvement of U.S. currency, the Court can find the defendant knew or consciously avoided knowing the payments were narcotrafficking proceeds based on the representations made to him by the CS and the undercover agents and based on the defendant's responses to those representations, described in detail above.

The defendant maintains that his insistence to receive wire transfers subject to bank scrutiny instead of cash payments demonstrates that he did not believe the payments were tied to narcotics trafficking. The claim fails to acknowledge, however, that the defendant was concerned about raising the suspicions of the U.S. banking and enforcement authorities by accepting the wire transfers as part of the sting transactions. During the June 5th meeting, the defendant questioned the undercover agent to ensure that he would send the wire transfers from a "generic" company because he didn't "want anything to come back to [him]." (PSR ¶ 18). At that same meeting and multiple times months later, the defendant suggested sending wire transfers to Dubai instead of the United States because "nobody is looking in Dubai." (PSR ¶¶ 18, 20, 60, 64-70). In other words, the defendant's unwillingness to accept cash payments, taken int this context, reflects the defendant's concern that he would get caught breaking the law rather than a sincere effort to fully comply with it.

Lastly, the defendant contends that he did not understand the cellphone payments to be derived from narcotics proceeds until after the sting transactions took place. According to the defendant, this is true because when the undercover agent represented to the defendant in late December 2018 that the payments were from drug trafficking, the defendant stopped transacting with the CS and the undercover agents. But this narrative, too, glosses over the facts. The defendant's response to the undercover's December 2018 representation was not to immediately stop doing business with the CS, Derrick, or Junior but instead to conduct transactions with them through Dubai, where authorities were less strict. Although those Dubai transactions never occurred, as described above, for approximately two months, the defendant suggested continuing business by sending payments to Dubai, and only when the defendant determined that banks in Dubai had also become "strict" did the defendant decide the risk was too great.

In sum, the Court can infer from the facts described above and in the Presentence Report that the defendant understood—or at a minimum consciously avoided knowing—that the cellphone payments he received were proceeds from drug trafficking.

*Second,* a sentence within the stipulated Guidelines range is appropriate to further the interests of general deterrence, and to send the message to others engaged in international business,

11

that crimes of this nature, which are unfortunately prevalent in the consumer electronics industry and often go undetected, will be prosecuted to the fullest extent of the law. General deterrence is an important sentencing interest specifically in the context of this type of offense because the integrity of our financial system relies substantially on the self-policing of business owners who use the financial system to conduct international transactions. So long as there are corrupt business owners willing to accept payments to facilitate unlicensed money transmitting networks, criminals can easily launder their crime proceeds. Accordingly, it is paramount that the Court impose a sentence that meaningfully deters others who may be tempted to engage in the same conduct.

*Third*, as to specific deterrence, the Government acknowledges that the defendant, having now implemented compliance procedures and experiencing the ramifications of this case, is unlikely to recidivate. Nevertheless, the fact that the defendant, without hesitation, was willing to risk his business and his "American dream" by committing a crime for limited financial gain indicates that a sentence greater than time served is warranted to deter the defendant from committing further crimes in the future. The defendant's expressed willingness to continue to engage in the conduct through Dubai over the course of several months in 2019 and the defendant's current reluctance to fully accept responsibility further signal a need for specific deterrence.

In addition to the arguments regarding his offense conduct, the defendant argues for a non-custodial sentence on the basis that the he has already been severely punished in light of press coverage, the imposed forfeiture, and the immigration consequences. First, the defendant claims he has been severely punished on account of negative—and according to the defendant, inaccurate—press coverage. Reducing a defendant's sentence, however, based on press coverage would lead to unfair discrepancies, resulting in lighter sentences for defendants with higher profile cases. Nor does it appear that the press coverage has substantially impacted the bottom line of the defendant's business, contrary to the defendant's contention. According to the defendant, Best Electronics made $162 million in revenue in 2019 prior to this case, and made $140 million in revenue in 2020 after his arrest in December 2019—that is approximately a 14% decrease from 2019 to 2020 which can be explained by myriad causes (including the pandemic). Certainly, any negative press and business impact arising from the defendant's offense conduct does not rise to the level of "severe punishment" that warrants a non-custodial sentence. Second, the defendant seeks to magnify the forfeiture amount by comparing it to his estimated profits from the offense conduct. But, forfeiture is not aimed at the profits pocketed by the defendant but instead at the funds involved in the offense over which the defendant exercised control—which in this case is almost $1 million. Third, The Government acknowledges the difficult and substantial impact of deportation, and the Court should take that into account. But the Government also notes that deportation is not unique to this defendant and many defendants—and their families—face the hardship of deportation.

The defendant contends that the need to avoid unwarranted sentencing disparities among similarly situated defendants weighs in favor of a non-custodial sentence. Yet, "a reviewing court's concern about unwarranted disparities is at a minimum when a sentence is within the Guidelines range," because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *United States v. Irving*, 554 F.3d 64, 76 (2d Cir. 2009) (citation and internal quotations omitted). "The 'mandate to take into account nationwide disparities under § 3553(a)(6) . . . is modest' and judges need only 'be mindful of the

general goal, however elusive, of national consistency.'" *Dodakian v. United States*, No. 14CV01188AJNSN, 2015 WL 11144511, at *21 (S.D.N.Y. Aug. 14, 2015), *report and recommendation adopted*, No. 14-CV-1188 (AJN), 2016 WL 3866581 (S.D.N.Y. July 12, 2016) (quoting *United States v. Willis*, 476 F.3d 103, 110 (2d Cir. 2007)(*abrogated on other grounds*)). The defendant cites to a handful of cases to argue that defendants in purportedly similar Section 1960 cases received non-custodial sentences and that only defendants in purportedly more serious Section 1960 cases, involving additional money laundering offenses, received custodial sentences. In other similar Section 1960 cases, however, defendants received custodial sentences. *See, e.g.*, *United States v. Ridgeway*, No., 16 Cr. 11 (E.D.N.C.) (defendant pled guilty to one count of Section 1960 and received a 15-month sentence for a loss amount between $150,000 - $250,000). Thus, the defendant's comparison to these cases, absent a more detailed comparison, is not instructive given the number of different factors that go into a Court's determination of a sentence. Moreover, the defendant's citations to civil forfeiture cases involving money laundering and Section 1960 violations are inapposite. As the Court is well aware, the Government has discretion in any case to determine whether to bring charges, there are numerous reasons prosecutors could have declined to charge criminally the cases cited by the defendant, and it is not possible to make any inferences on the basis that these cases were not criminally charged—nor is there any basis to determine what sentence a judge would have imposed if those cases had been charged criminally.

The Government notes that the defendant's sentencing submission includes numerous letters from friends, family, and business associates highlighting the defendant's substantial dedication to his family, friends, and work. The Court should take these into account. However, on balance, the seriousness of the offense, the need for general and specific deterrence, and the defendant's reluctance to fully accept responsibility for his conduct indicate that a substantial sentence is warranted. Moreover, to the extent the Court imposes a below-Guidelines sentence, a fine would be appropriate, consistent with Probation's recommendation, for all the reasons provided above in support of a Guidelines' sentence. According to the Presentence Report, the defendant has the financial resources to pay a substantial fine.

### C. Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence within the stipulated Guidelines range of 30 to 37 months' imprisonment would be fair and appropriate in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By: _____
Tara La Morte
Cecilia Vogel
Assistant United States Attorney
(212) 637-1041/1084

cc:   Peter Skinner, Esq. (by ECF)
      Brendan Quigley, Esq. (by ECF)